Thank you. We will go on to Western Watersheds and we will have Mr. Alan Nain first and Mr. Kast second and you need to tell me how you're splitting your time with regard to rebuttal. I'd like to have the time on the clock, please. 12 minutes and 8 minutes. So why don't we begin with Mr. Alan Nain. Good morning, Your Honors. Daniel Hleinen for the United States. I'll be taking 12 minutes of the appellant's time today and I'd like to reserve two minutes of that for rebuttal. The main issue in this case is whether the district court properly set aside five of BLM's leasing decisions and about 600 of its leases after holding that the agency's guidance on public participation was unlawful. The court concluded that IM-2018-034 violated NEPA and FLIPMA and that guidance subsequently has been superseded as of last Friday when the Bureau issued new guidance on this issue. But the five lease sales at issue in this case did not violate the public participation requirements of NEPA or FLIPMA and the court was wrong to set them aside on that basis. Even if the Bureau did fall short of its public participation obligations under either of those statutes, the remedy of vacater was jurisdiction over, I guess, now you're just arguing the lease sales, but even over the lease sales. It seems to me that to be appealable as an injunction or an order having the practical effect of an injunction, an order must be enforceable by contempt. How will, can you discuss those issues and how will the order vacating the lease sales in particular be enforceable? Of course, Your Honor. So the order at issue here sets aside the leasing decisions under Section 706 of the APA under the statutory authority there. But the order goes further and setting aside the leases as well by requiring the government to terminate those leases and cancel the... But where does it explicitly do that? Does it explicitly require that? So in the district court's summary judgment ruling at page 70 of the federal government's excerpts, the court says that the order will require the Bureau to cancel the leases and refund the proceeds. This is, I believe, in the discussion of the remedy. You may say that, but it's a weird thing because there's no, usually an injunction says, therefore, you are ordered to do X. And it doesn't say that, does it? So the order specifically refers to setting aside the leasing decisions. But what the parties have always understood this litigation to be about is the cancellation of leases. And I think if you look at the litigation on the motion to stay and reconsideration, I think the basis for seeking to stay here and the reason that was contested was because the understanding from the district court, from the government, was that the order would require the cancellation of leases and refunding revenue, much of which has already been distributed to the state of Wyoming. Right. But would the court really be able to hold you in contempt for failing to cancel the final judgment here? So if the order were not immediately enforceable and the government was not required to take any action with respect to the leases or refund monies until the entry of final judgment, I think we would be in a different situation. You know, final judgment still has not issued. There's still pending district court litigation on the other phases. So if the government wasn't required to do anything until final judgment issued, maybe then there would be no basis for an interlocutory appeal. But I think the motions practiced below in the district court's sort of analysis of what would be required from the order and its decision to stay as order pending appeal both indicate that the court understood its order to require the cancellation of leases and the refund of monies on a sort of deferred basis. Counsel, since I take it your adversaries say there's no jurisdiction because there's no contempt enforcement, who would challenge you if you just said, fine, we'll sit here and wait for judgment? They would be hard put to try to bring some kind of enforcement when they've just said that there's no enforcement. So why wouldn't that be your better position? Or alternatively, if you really wanted a decision, why didn't you do a Rule 54 certification, which apparently was fully considered? That part is the part I don't understand. So I think on the first point, Judge Boggs, about, you know, plaintiff's lack of interest in enforcement, I don't understand the position to necessarily be on their part that we're not required to do those things. Of course, I can't speak for plaintiffs, but the idea that they might not move to hold us in contempt of the order, despite explaining to the court that they thought a stay wasn't necessary because this stay wasn't appropriate because they had an interest in these leases being vacated. I don't think that's sufficient assurance for the government that it is free from the threat of sanction. In terms of the Rule 54 certification, that certainly is an option that is available. But I think from the government's perspective, when we're subject to an order that potentially requires the immediate cancellation of 600 leases, the refund of $100 million. I don't really understand the refund part. There's nothing in the vacating of the leases that necessarily orders a refund. I mean, there may well be other things you could have done. You could have waited for somebody to sue you for the money. You could have applied it to something else. You could have put it in escrow, quite possibly for the appeal. I mean, I don't know where you get from the vacating to the funding the money. So I think the cancellation of leases, if cancellation is required, inherently requires the Bureau to go through the process of refunding revenues from an improperly issued lease. And I think that is borne out, again, in the district court's decision itself and its decision on the stay, where it contemplated the government being required to refund $100 million and discuss the hardship to the government in that context. And the funny thing is that the one thing here that seems clearly to be an injunction was the order on the stay, because at that point he was making, ordering things other than simply vacating the judgment. That seems to be an injunction, for sure. One thing that I would just say at this point is that I think when we're discussing vacater, it is, of course, a statutory remedy, but it sits within the sort of general category. So is your bottom line position that in any environmental case, when there's a vacature of a decision, that that's an injunction in appeal? No, Your Honor, I don't think that's what's the difference. Also, we have the case, Alcee Valley Alliance case, which makes clear that that isn't true. Right, and I think that's a great example of a situation where, as a contrast to this situation, in a run-of-the-mill APA vacater situation where the court is just setting aside a government action and sort of wiping the slate clean, leaving the government free to take whatever action it thinks to be required, I think, you know, that the government would be hard-pressed to suggest that that is sufficiently injunctive. Oh, why? I mean, ordinarily the way those cases are structured is you have a NEPA action report, and then you have a ROD, a report of decision, and formally the case is a decision, that's the one that's being appealed, that's the subject of the district court case, if it's one that goes to district court, and then if it's vacated, then the government, you know, although it was able to do that thing, whatever, you know, build the building the next day, now it can't, or maybe even started building the building, now it can't build the building. What's the difference? In the meanwhile, even if it's for three years, they still have three years, they can't build a building, that would be an injunction, but ordinarily, and that's what I understand the Alseem Valley case to be, so what's the difference? I think, Your Honor, there's a difference between normal, sort of, vacater of agency actions that leaves the government free to sort of reassess an issue and determine the proper course. But not free to do whatever it was going to do in the meanwhile. In other words, you have a NEPA inquiry with regards to can we build this bridge, right? And you have a rod that says, we've done all the NEPA work and our decision is we're going to build the bridge. And the government's ready to build the bridge and somebody comes in and sues them, saying your whole NEPA investigation was wrong. If the ordinarily, as I understand it, the order in that case, if they prevail on their NEPA argument, is you vacate the rod, the decision to build the bridge. So now the government can't build the bridge. What's the difference? It's not just, yes, they can do it over again, and they can do it over again here, too. But in the meanwhile, they can't do it. I think that is the distinction. I think your Honor's example is similar to Alsaia Valley in that the government could go back and potentially re-reach that decision. But that's true here. I mean, in fact, that's, I mean, when you get to the remedy question, it may have been a much more logical remedy, actually. And what the government, what the stay order ultimately does is say, don't disturb the land, but you don't have to give back the money, but do it over again. And if we get to a remedy discussion, that's certainly a distinct possibility. But even if not, they can do it over again. They just have to do it with public participation. In this case, it's more clear in this case than in the other one. Your Honor, I think the distinction is that if there is a remand without vacater, the government can do it over again. If there is a vacater without, if the leasing decision is vacated and leases are required to be canceled, those leases are gone. They can't be reinstated subsequently through. Why not? Why? Couldn't they put them up and then have the right participation and then reissue them? So those would be new leases then, Your Honor. The government could go and conduct a future lease sale and offer those parcels again, potentially, if the leases have been vacated. But as I think is explained in the Hoffman Declaration that we submitted to the district court, you know, the market would be significantly distorted at that point. The previous lease that was issued in 2018 would be non-existent. We would be talking about a new lease. So they would be new leases. They might well go to different people for different amounts of money, for example, in different combinations as well. Is that right? That's exactly that's exactly right, Your Honor. And, you know, you know, of course, revenue is not the most important issue here. But just even looking at that issue, you know, the consequences of a new lease sale are up for debate. And, you know, in the recent economic climate, you know, there would be likely a different outcome in terms of what the lease sale does for public revenue. We've used up all of your time, but maybe at least we won't use the same time up in the next case. So why don't you go on for, let's say, five minutes for the rest of your argument. Sure, Your Honor. So just to quickly address the effects of the 2018 IM's withdrawal, we don't think that has any effect on sort of meeting the issues that we've brought to the court, except for potentially the injunction requiring the government to comply with the 2010 IM. I just wanted to highlight that the new IM essentially effectuates the district court's order by adopting that policy nationwide. But to the extent there still is an injunction requiring us to comply with the 2010 IM, unless and until the district court, unless and until the bureau conducts a notice and comment rulemaking, we still think it would be appropriate for the court to vacate that. Plaintiffs have said they're not really, they don't even really think this is an injunction. So I don't think there's any basis for this injunction to continue and it can be set aside as procedurally defective as we as we laid out in our briefs. On the merits, I think I wanted to just highlight in particular the district court in concluding that the IM violated NEPA was sort of holding up the 2010 IM as a comparator and suggesting that 30 day public comment periods on EAs was sort of the standard that the 2018 IM failed to meet. But a significant number of the leases here, particularly those in Wyoming, are supported by environmental assessments with 30 day public comment periods. This is the June 2018 Wyoming sale, the June 2018 Nevada sale, and a significant part of the September 2018 Wyoming sale. So I think, you know, on that basis, there's no, even under the district court's own decisions, violated NEPA's public participation requirements. Were those NEPA determinations about the specific sales? These are environmental assessments for those sales, yes. For specific sales. And then what happens next is that those sales are then, after the NEPA statement, the NEPA analysis, are then put for sale and then there are notice for sale. You, by the way, say in your brief that it was 10 days after the sale, but it's actually 10 days after the notice of sale, right? That thing that under the later, the 2018 order, there was a participation. But so there's a notice of sale and then 45 days or 90 days later, there's an actual sale. Is that how it goes? But it's all exactly the same sale. So the Bureau conducts environmental assessments for groups of parcels. So some of these sales, it's just one environmental assessment. Sometimes it's multiple assessments for multiple parcels. Then after conducting that environmental review, issues the notice of sale and apologies for the misstatement in the briefs, within 10 days of the notice of sale, the government will accept public protests and then address those protests before conducting the sale. At the sale, the leases are sold. Then before there's any development, there's an additional process. But your essential position is that the protests are sort of pointless or not important. It's only the comments on the NEPA that matters because otherwise the 30 days on the NEPA wouldn't matter because you'd still have the 10 day. You'd still have to cut off on the participation on the protests. So the public participation under FLIPMA, there's no formal requirement in the Bureau's regulations or anything like that to have a 30 day public protest period. The Bureau does permit public protests of 10 days, but that's perfectly compliant with any public participation requirements in FLIPMA. So these are two separate processes. To the extent FLIPMA requires public participation, that could potentially be satisfied by participation in the environmental review process under NEPA. But here, what's important is that nothing in either of the two statutes prohibits BLM from providing the amount of public participation that was provided in these particular sales. And just with my last minute on the remedy point, unless Your Honor has a question. On the remedy point, I think this court in cases like Idaho Farm Bureau and California Communities Against Toxics has addressed failures in public participation and concluded that in those circumstances, a remand can be appropriate, particularly in this case where, as we've argued, there are significant consequences. This is the type of thing that the Bureau can address on a remand accompanied by a protective suspension of operations on leases along the lines of what the court ordered in Connor against Burford to protect the sage-grouse conservation interests that are at issue here and permit the Bureau to go back and revisit. And this process conducts new public comment, received comment. And again, there's very little, there's only seven wells that have been approved thus far and the court can issue a suspension order that prevents further development. Well, first of all, do you have anything to say on the venue issue? I just wanted to emphasize. So it is complicated and I think it might take a while to explain. Well, I don't know if we have a while, but my best guess is that you waived it because you didn't raise it originally. But the district court did decide it. Right. But does that matter? Usually it matters, but it doesn't matter in this context. Can a district court, does it have any authority to say, well, there's no venue even if it wasn't raised? Your Honor, I think it's just a futility question. In these leasing, mineral leasing challenges, you know, often the government will seek to litigate these in successive phases and at times plaintiffs will add new leases, new leasing decisions to the case as it goes on. The government did not originally raise this. The government moved to transfer as a discretionary matter, mentioned the property issue, but did not. But it didn't say there was no venue. Correct. An intervener did make that argument. Therefore, I don't know what the successive phases has to do with it. The government didn't raise it. So the fact that, so the question is, I understand why it didn't raise it the second time if it thought it had been decided the first time. But the question is whether having been decided the first time there was still a waiver and you couldn't do it, it was out of the case as far as you're concerned. Even though usually if the government, if the district court decides something, then we can consider it. But with venue, I'm not sure that's true. Sure, Your Honor. I recognize that it's a complicated issue. I would just say that, you know, the merits position we have here, I think is clearly correct. The exception to residence-based venue in the statute was added specifically for this type of case. So if the court concludes that it's appropriately before it, we would ask the point. There must be a reason the government isn't raising it because you didn't raise it on the other case either. So I think in the other case, our preservation argument is not as good as this one. I recognize that. Well, you definitely didn't raise it in the other case. You didn't brief it. But I'm saying that there must be some government reason why the government isn't raising these venue issues. I think you're happier to have everything in one court, which I can well imagine, which is exactly. The issue is perhaps more on the government's mind now than at the initial stages of both of these cases. Okay, thank you. Thank you. Thank you. You are very well over your time. We will give you a minute in rebuttal, assuming I remember to do that. Thank you. Um, the next is Mr. Kast. May it please the court. And would you please stick to issues that we haven't already discussed? This is why I hate split arguments. You should never do it. I don't know why you did it. Go ahead. Thank you, Your Honor. My name is James Kast.  of Wyoming. I'd very much like to just talk about the merits of what I think the central question is in this case. And that is whether the advocacy groups actually had a meaningful opportunity to participate in the BLM's decisions before they were made. Before you get to the merits, and I'm sorry, Mr. Kast, to interrupt your flow here. But can you tell me what your view is and whether you agree with the federal defense, representing the agency here, that the challenge to the instruction memorandum is now moved? I think it likely is. Instruction memorandums come and go. They're usually not determined to be final agency actions. That was the determination of the district court in New Mexico on this very instruction memorandum. The district court here found it to be a final agency action, but it's subsequently been replaced as they often are. And so our arguments, the state of Wyoming's arguments in this case, are unrelated to the contents of the 2018 instruction memorandum. Our view is that the determination with regard to each individual lease sale, whether it complies with NEPA and FLIPMA's public participation requirements, rises and falls on the facts of those lease sales. Regardless of the content of the 2018 IM, and I believe that it is moot and it's certainly gone. And so I want to focus on what I think the fact-intensive case-by-case analysis requires for determination for the two Wyoming lease sales. Thank you. And the facts of this case are, I think, pretty clear and pretty compelling. There were four environmental assessments prepared for the two Wyoming lease sales. In three of those four environmental assessments, the advocacy groups actually received a third 30-day period of time to prepare and submit their public comments. Nobody has ever said in the course of this litigation that 30 days was insufficient. So for three of those four EAs, they received the meaningful public opportunity to participate that they and everybody else thinks is appropriate. So we really- What about on the protests? The protests are not part of the meaningful opportunity to participate in the BLM's required by NEPA or FLTMA because they're after the decision is made. The public's opportunity to participate under both- Somebody must think they're worth something because you have them. Sure. And protest periods, I like to think of them as akin to your rules that allow people to file a petition for rehearing. You don't usually grant them. People don't really have necessarily a right to rethink the decision, but every once in you realize it and you give yourself the opportunity to fix it. It's not in this case, the public comment period is the period that matters, not the protest period. As the district court in New Mexico stated recently, the public protest period, people don't have a legal right to that. And without a legal right, there is no remedy. So is it your view that the Bureau could provide zero participation and still comply with the statutes? After the decision is made, no protest period is required. Before the decision is made, NEPA and FLTMA both require meaningful opportunities for public participation. And so the question here is for the three EAs where 30 days was provided, that's obviously sufficient. For the one EA related to the September sale in Wyoming where 14 days was provided to submit on what actually happened here. And here, the advocacy group submitted extensive thorough comments in response to that 14 day comment period, and they did them on time. And they never said in those public comments that they needed more time to prepare them or that they were prohibited from putting together some really important piece of information. Well, there are now extensive declarations in the record and it doesn't pertain to that particular sale. The declarations in the record are very generic and not a one of them says specifically, I would have said this and it would have mattered. They usually say, I would have said more if I had more time and that is not enough. Well, obviously they don't know what they would have said because their whole problem is they claim they didn't have enough time to go out there and do the research. And this litigation is their opportunity to make that case. They've had three years to find new science that they could have provided or say, hey, this parcel has conditions on it that mitigate against the decision to sell that parcel. The litigation is their opportunity to demonstrate that they would have said something important and new that would have made a difference. And they haven't done that. And if they don't do that, then they can't demonstrate that they've been harmed by the shortened public comment period. Now, the district court said, well, geez, no harm, no foul thing. That doesn't seem right. But harm is an essential component of every APA case. You must prove that your legal rights were harmed by the agency's action in order to prevail in an APA case. And without saying, here's some science that I had and didn't have the opportunity to present, this specific thing and this specific thing would have made a difference. You're not harmed. You're just complaining about the possibility that some of the words that you might have thrown out there, if you had more time, maybe they could make a difference. But we're not here to deal in speculation or possibilities. We need a concrete entry. And that demonstration has been lacking in this litigation throughout. Can we talk about the vacature and the impact of the vacature on these sales? Because I think it's closely tied to jurisdiction as well. Whether or not there's going to be jurisdiction here. How does this work? How's the vacature going to impact you? And is there a real consequence of being found in contempt? Well, there's certainly a real consequence for the state of Wyoming because the federal government, after canceling the lease, is required to refund the money that Wyoming received. In this case, that's about $47 million that has already gone to Wyoming. Can you tell me where that requirement exists? Yes, that's in 30 U.S.C. 1721A. We have to pay back the money. It would be neat if we didn't, but we really do. And we have to do that when the lease is canceled.  How is this different than just a regular case where you were going to build a bridge and you're precluded from building it until you finish your NEPA analysis? In this case, what the district court's order does essentially is say, tear down the bridge you already built. That is very different than saying you can't put the bridge yet until you complete your NEPA. Suppose the remedy were adjusted to be what it is on the state order. I.e., don't do anything to the land in the meanwhile and go do the public participation. That solves your problem. That solves my problem. You don't have to give back the money now. Sure. Just suspend the lease, basically. If the case was remanded to do the public participation in a different way and the... But with the additional order that the leases are to be non-functional in the meanwhile. I.e., there's to be no development under them and the money should be escrowed or something. That solves the problem with regard to the disproportionate consequences of vacature. That's what other courts have tended to do in these same circumstances. To say, all right, there's an opportunity for you to go back and do your NEPA analysis in a way that conforms with the law. And in the interim, we're going to maintain the status quo. The leases continue to exist, but no surface disturbing activities will happen until the new analysis and new decision is complete. That would have been an appropriate remedy under the circumstances in this case under the Allied Signal Test. Well, I guess maybe I'm asking the same question that Judge Berzon did. But because the plaintiffs assert that you would not be required to return the funds, but what could instead keep them as sort of an advance payment for future sales. I guess, you know, that's what they're saying. And I'm trying to figure out how does this work? And because all we have from the district court is vacating the sales of the leases. And so even if there is the consequences, is it premature at this point to assert that? No. So the district court's order sets aside the lease sales now, absent the stay order that's currently in place. And setting aside the lease sales now then requires the Bureau to take all reasonable actions to effectuate that order. And that means since the sale didn't occur, the leases have to be canceled. Once the cancellation occurs, what the federal government does is that it out of the proceeds of future lease sales, it deducts the amount to be refunded from the proceeds to the state. So I am not going to be forced to write a check to the federal government today. But as future lease proceeds come in, the federal government deducts this amount. And I have no control over that. They simply do. So the monies Wyoming has received currently, we don't refund. But the monies that we would receive in the future, our future revenues are reduced. And does that include just lump sums or are there also ongoing royalties or payments that you might have been counting on? Well, obviously, this includes just the amounts that were associated with the sale of the lease at the outset. But... Now I'm talking about the parts that would be offset in the future. The parts that are offset in the future are just the proceeds of the lease sale today. But not having the leases, of course, precludes production. So there's no royalties or other monies associated with it. But what you're saying is that if they make lease sales in 2022, you wouldn't get that money and any of that money until you used up the credit, let's call it, from this. Is that correct? That's correct. I'm now down. I would be down minus 47 million in the new revenues until they get past that. I don't really get it. Royalties on past sales that there's no quarrel about. They would keep coming in. They don't deduct those. It comes out of the lump sum that the state gets and we get it in multiple ways. So, I mean, the easiest way to think about it is... I'm just thinking if I'm the Wyoming state treasurer, forget the lease sale. I'm counting on these past royalty revenues. Are those going to be docked? I guess that's the way I'm asking the question. Yes. The answer is yes. Okay. We are going to get docked. In a vacature decision that requires the federal government to get the money back from the state. So, the natural consequence of setting aside the lease sale is a requirement of the BLM. Because now that sale and the leases that followed are... Natural consequence, which exists in some regulation or requirement or somewhere. So, the federal regulations do and the general... I think it's 30... 30. You cited 30 UFC something. In a way that makes me think that that's what says you have to pay back the money. What says that the state of Wyoming has to pay back the money is 30 UFC 1721A. Okay. That is different than the process that BLM goes through when there's a determination that a lease is invalid at its inception. When that happens, then they have to cancel the lease, which then triggers our duty to pay back the money. It's absolutely true. The district court could have made our lives easier by sort of spelling out all the steps that follow from setting aside the lease sale. But it cannot be true. The district court didn't think that. Nobody here really thinks that by setting aside the lease sale, the bureau doesn't have to do anything. And these leases can just proceed on just fine. So, what do you refer to right now? And then you also referred to it earlier. What would have been acceptable? What would have basically been the hold that some courts do? What is that process? That is remand without vacature, coupled with suspension of surface disturbing activities, which preserves the environmental interest at stake during the remand process. It preserves the status quo. So the leases continue to exist. State of Wyoming doesn't have to return any royalties. The federal government doesn't have to return any royalties. The agency can then do the NEPA process in a way that is proper if it was improper. And what was it? Is it remand without vacature and suspension? Can you finish what you just said right there? What else was it? That was it. Remand without vacature and then suspension of the surface disturbing activities. And did you argue for that down below? The arguments with regards to remedy in front of the district court at the summary judgment phase were not very false. Okay. So then you did ask. My understanding is that actually. Did you argue for that below? Did you? I understand what you're saying, but I just want to know, did the district court consider that and reject? We did make that argument. But it was brief at the very end of long summary judgment brief. We had asked for and sort of counted on the opportunity to have a more fulsome discussion of remedy. But the district court went ahead and decided what it thought the appropriate remedy was. Apparently, I gather that the plaintiffs did argue about the remedy and you would have had an opportunity to do it. And in terms of what you argued at that point, did you argue what you just said? Or did you just argue that for non-vacature? You're arguing for non-vacature along with suspending the circus disturbance and so on. I believe that the parties on this side of the V argued for remand without vacature. It didn't say much more than that. Right. So you didn't make this proposal as such. You did at the point of the stay, but not before that. Like I said, it wasn't very clearly articulated, but I believe we asked for remand without vacature. Okay. All right. You are very much of your time. Thank you so much. Mr. Lucas. Thank you very much. May it please the court. Laird Lucas for Plaintiffs Appellee's Western Watersheds Project and Center for Biological Diversity. I know there's a lot on the court's plate. I want to just pick up quickly from what Mr. Castee was saying about the remedies. Bear in mind, assuming you have jurisdiction, which I'll get to in a second, this is an abuse of discretion review by this court. Mr. Castee or Wyoming's favored remedy is something the district court did consider. And in the second part of the district court's order, it looked at the allied signal factors and applied them to determine whether to depart from the normal remedy of vacature, the normal remedy under the APA. And it weighed these considerations and said, no, I'm not going to do it here. And it disagreed with the suggestions of counsel. Where in the record is that? This is in the district court summary judgment decision, federal ER beginning page 13 to 74. But the discussion of allied signal and the vacator comes near the end of that decision. And that's what I believe. Where? Do you know where? Sure. Pages 57, beginning of one federal ER 69 to one federal ER 73. And those are pages 59 to 57 to 60 of the summary judgment order from February 2018. So that is the reason why this seems unusual. I mean, this is about, you know, vacature versus nothing, as I understand it, right? Versus let them continue doing what they're doing. But it seems that unusual situation and the fact that you can entirely protect against the injury by suspending any development pursuant to the leases and entirely protect the right to public participation by going and redoing the public participation. So in many instances, to have not have vacator means that the decision will go forward. But the whole the environmentally consequential parts of the decision will go forward. But in this instance, you could prevent that. You could prevent the environmentally consequential parts of the decision from going forward. So why is that the more sensible way to approach it? I respectfully disagree, Judge Burson. The point of the fact is these leases were issued in violation of the public participation requirements. And what you're hearing from both federal defendants and Wyoming is these leases should stay in effect. They should be determined. They should still be out there. I don't care what they're saying. I'm saying why isn't the more sensible thing to do to say that they shouldn't have any operative effect, i.e. you can't do anything under these leases. I'm sorry, because of the fact that the NEPA process, which is intended to be before the decision was flawed. And you can't say the decision can be rescued in this circumstance. There are other cases where courts have said, sure, you can pause it, suspend it, go back and do more environmental review, look at the effects of this or that. But this is more fundamental to it. It was fundamentally about how are we going to be administering these millions of acres of public lands within key sage-grouse habitat? Are we going to be giving out lease rights or not? You're disagreeing about this question, by the way, we didn't ask you that. I'm sorry. Do you agree or disagree that the validity of the overall process is no longer before us? I'm sorry, I couldn't hear the answer. Do you agree or disagree that because of the April 30th reversion to the 2010 process, that issue, the tens of thousands and hundreds of thousands of acres and all, and the generic process is no longer before us? I agree that the federal defendants' appeal of the remedy on the instruction memorandum is moot. The federal defendants have voluntarily complied by adopting a new instruction memorandum that has the same provisions that were in place before. They have not done public notice and comment rulemaking, which was part of what the district court halted them for in adopting these things. FLTMA requires regulations for public participation in land management decisions, and there are no regulations for public participation in oil and gas leasing. That's one of the underlying things. For purposes of the appeal, the government has acceded to the one issue they challenged, which was the remedy on the IM. So that's out. Now, the Intervenor Western Energy Alliance, which is going to be presenting at the next case, but not this one, they've tried to appeal the whole ruling on the IM. They believe that the IM, the district court, wrongly held the instruction memorandum to be a final agency action that was wrongly adopted. As we pointed out in our brief, they didn't attack the district court's findings and conclusions that it was violated the APA by not having notice and comment rulemaking. So we don't think their appeal is valid anyway. But you have to look at their appeal. I would also say with the government not contesting the IM remedy anymore, if WEA wanted to challenge that, they would have to show standing to appeal under Diamond v. Charles and Didrickson of this court and all of that. And they haven't done that. I don't think they could show any injury from the BLM now adopting new procedures for oil and gas leasing. So I do agree the IM is out of the appeal equation, but it's very much a part of the district court's rulings in holding the five lease sales unlawful. And counsel keep talking about NEPA and FLTMA don't require protests or they don't require any limit on environmental assessments. They are ignoring the whole facts surrounding this situation. The Bureau of Land Management itself in 2010 decided that they needed both 30-day comment periods and 30-day protests in order to be adequately informed and make good decisions for the public. Counsel, if I could, if I could ask about that, is that basically the argument of what I call the one way ratchet that whenever the government decides that X amount of participation is good, they can never go back from that, that you don't anymore look at general adequacy because if they did it once, then clearly it's practicable. Is that basically your argument? Not quite, Your Honor. What my argument is, once they decided that better decisions come from more input, if they're going to change that, they have to have a reasoned explanation. This is the change in agency policy, Fox decision from the U.S. Supreme Court. Many decisions say when an agency writes on a blank slate is one thing, but when it changes policy, it has to. When you talk about changing policy, is that independent of whether, in fact, you should have had a notice and comment rule? That is, if it's only a guidance document, you know, that's what we have in other areas. All of those also require the same level of intellectuation under the Administrative Procedure Act, Your Honor. The agency has to articulate reasons for changing its position, and that requires looking at both the costs and regardless of whether it reaches the status of a rule or regulation. Correct. So, if the issue of the validity of the IM is no longer before us, and we simply have a whole set of individual sales, some of which, in your view, or not just in your view, but did not have the degree of public, I guess all of whom, I guess, did not have in total the amount of public participation that would have been required by the 2010 provision. Is that right, first of all, that if you add up the NEPA time and the protest time, that none of them had the full amount? That's correct. That is correct. Every single one of the five states. So, is your position then that that was a change of position? With that regard to the validity of the overall IM change in each on-the-ground decision? I'm sorry. It was not only a change in position. BLM recognized that. As we pointed out in our brief on page 17, the administrative record, even for the Wyoming June 2018 sale, that's the one that had more compliance. The BLM recognized that by going from 30-day protest to 10-day protest, they would be unfair to the commenting parties because people were expecting the normal time. BLM knew this was cutting off public input. And the BLM Wyoming office said, hey, maybe we should allow 30-day protest anyway. And they were told by the Washington, D.C. office, no, the item is in effect. You will only allow 10-day protest periods.  Parts of BLM did. Apparently, other parts didn't. Well, that's right. This is what I'm trying to understand. So, is your technical argument that the APA failure to explain the change issue was still in the case because the actual time applied on the ground was different than what the earlier provision would have required? That is correct, Your Honor. And at least for three of the Wyoming sales, am I right, the defect would solely have been in the protest period. There are two Wyoming- Three was 30 days. I'm talking about by three. I'm sorry. There's so many ways of attributing it. What I'm calling three is the June sale and then the two different aspects, High Plains and Wind River of the September sales. That's correct. They were doubled up. In September, they did what they called the double up. So, they originally offered 140. I don't know. I've got that. But that's what I'm calling the three. And so, the defect then was the shortened comment period, correct? It was a defect in the comment period for September 2018 because they added all these in at the very last minute. All down the line, the protest period. So, number one, your position is that that's in itself fatal because, is it strictly because they didn't explain it or that a protest period is in fact required? Well, a protest period was required under BLM's own procedures until they- Well, I understand. What Judge Box wants to know is if suppose they had never done that, suppose there simply was no protest period. Would that be in line with the statute or the regulations? It never happened and there wasn't one now. It would not. It would be problematic because the Mineral Leasing Act does allow for protests. The Mineral Leasing Act regulations and- Allows for is different from requires. That's what we're trying to say is that if they with full reasoning said, look, comment is enough, they can sue down the road and just making us go through another rehearing, you know, isn't efficient. I don't know that they've said that. I might like to ask them, what's the difference between 30 days and 10 days? But you would think that if a protest period was in fact important enough to be required, somebody would have put it in a statute or in a notice and comment regulation. And this is one of the problems with this situation that BLM is not in compliance with FLTMA, which does require regulations for this kind of public involvement. They don't- That's not this case. That's not- Okay, then that would be, that would have been the case all the way back to 2009 or before. Okay, let me- Your Honor, I do have one more thing on that. The Department of Interior and BLM have appeals regulations. And they say, if you don't raise things in protest, you have waived them if you want to go to court later. And they often try to enforce this. The exhaustion requirement that you have to do it through a protest is part of the department's own appeals regulations. So we have to be able to participate meaningfully at the protest period. And as the record here shows for, you know, I know Mr. Cassidy was focused on Wyoming, but we've got Nevada and Utah- Okay, counsel- And they have no EAs. Counsel, I get the point. Now, what I'd like to ask is with regard to the question of invalidity because of time, let's say 30 days, 10 days, as opposed to a declaration or something of what actually went wrong, okay? Because I guess my problem with this case is I would say to the BLM, why does 30 days hurt you more than 10 days? To your side, I would say, what did you actually not get to do that you could have done with more time? My analogy is in a habeas case, you generally can't just say, my lawyer was stupid. He didn't discover something. You know, all the cases I have, you come in and say, he should have interviewed this witness. And here's what the witness would have said. He should have discovered that my client was incompetent. He should have realized that he had a bad childhood. You don't just say, I had a bad lawyer and if I'd had more time, he would have done something. So I read your declarations. Okay. And what I would have been looking for was, if we had had more time, we would have visited. And when we did visit, we found there's all these sage grouse nests, or we would have found that there's something evil that we would have complained about. Is it that you don't have to do that or that your declarations were good enough? Our declarations were good enough. We specified things like not getting out to be able to see the area, not being able to confer with Native American tribes about cultural resources, not being able to plot. Okay, I hear that. But you don't say, but am I right? You don't say, we did go and check later. And we found all this stuff that we would have said if we'd had time. Every lawyer thinks if they had more time, they would have made a better argument. But usually they can write down what that argument would have been that came to them in the shower. And that's what I'm missing. Or am I missing it? I think you are missing it. I think we really fleshed out the record. And the judge, Judge Bush, spends about six pages in his summary judgment opinion, single-space quoting. But you didn't do that. The question is, do you have any obligation to do that? I mean, the suggestion is that you should have, after the fact, and without knowing whether anybody was going to listen to you, gone out and done all this on the ground research in order to demonstrate that you could have presented something beforehand that was different than you did for research. Do you have that obligation? You didn't do that, right? The question is, do you have that obligation? I don't think it's required. I don't see how it's required. This is public involvement under NEPA to ensure that agencies are informed ahead of time. And we've identified very specific things that we weren't able to do in our declarations. And the judge credited that. Now, I know it's a de novo review, but... You gave very specific operational things, but not any idea of what would have happened if you'd done those operational things. I guess, Your Honor, I would say our comments are filled... I tend to think that you probably don't have to, but you didn't do it. Our comments were filled with lots of reasons why these EAs and DNAs did not comply with NEPA from all kinds of scientific reasons. It's true. But there is also a strong showing of how we were not able to make the precise investigations that would have been required. All right. Can I ask you to address the injunction issue? Yes. And thank you, Your Honor, because I do think... And I know you're out of time, and I won't give you some more, but the venue issue as well in some fashion. When the government mentioned that the court's order anticipated refunds of money and all of that, that was in the section of the opinion applying allied signal to determine whether to depart from vacator. The order... The judge's ruling itself simply says the lease sales are set aside. That's on 1 Federal ER 74, the end of his decision. He did not remand. He set aside the sales for being unlawful. There is no injunction. He determined whether to depart from that remedy by looking at allied signal, the seriousness of the violations and the harm. He considered those issues that they raised. They would naturally flow from court rulings. And your issue of the bridge, I thought, was useful. If an agency determines to approve a bridge and does it unlawfully under NEPA, it's set aside and they can't build the bridge. Mr. Castee says you have to tear down the bridge, but that's not right. These leases were simply issued. Only seven of them have been developed so far. And there was... The court looked at what might be the consequences, but it didn't order them. So what about Alcea Valley? And more broadly, why wouldn't this apply to any? Again, this was not a rule. So you're relying on Alcea Valley and you would think Alcea Valley covers everything. Well, Alcea Valley is a place where the court found that the agency erred and remanded for it to do a further rulemaking. This was a decision to award leases and it wasn't remanded. It was just set aside those leases. They need to redo it. And that was appropriate. Think about a timber sale too. If you had a timber sale that was approved unlawfully, somebody has already bid for it. The timber sale is set aside. The Forest Service cannot allow the purchaser to go out and cut that timber when they don't have a valid record of decisions. There are consequences such as contract refunds or other things that happens all the time in other types of litigation like logging. And here, it's just the same analysis. And we cited numerous cases- Do you have any clue why nobody asked to certify the interlocutory appeal? I have been puzzled about that since day one. And I will say that in the record, the federal excerpts of record, volume six, 1283 is our stipulation or our joint litigation plan, which said that no party would oppose a motion to certify the court's phase one decision- Would it fix all this with a limited remand to the district court to certify it? Could be done. It could be done. And Your Honor, I will say there's a case, Ninth Circuit case, Kirsch, K-E-R-S-H, 804F2nd 546 at 547 note one. It was a similar situation. The court looks like it sort of stayed the appeals proceedings while the parties went back to the district court to get a rule 54B certification. I'm not saying that that could be done here. It's the pellant's burden to show jurisdiction. We do know that these issues are important. And with the I.M., with the government having accepted the I.M., it narrows them down. We have two more phases of litigation in the district court. Phase two is briefed and argued, and it's all about the 2017 sales and whether they violate NEPA. Phase three is underway now. It's more sales from 2019 and 2020. And then we're going to be done. I think we'll have final judgment within about a year in this case. I think that if the court were to dismiss these appeals and send it back to the district court, we could well go through more proceedings to get it teed up for interlocutory appeal, but I'm not sure it would be worth it. So, you know, I'm a little bit at a loss what to say about jurisdiction. My time is almost up. I would like to talk about the venue real quickly. You're out of time, but keep going. I misread the red light. I took it for a green light. On venue, they have waived it. Rule 12B3 provides for dismissal for improper venue. And rule 12H says, if you don't raise improper venue in your first motion or responsive pleading, you have waived it. And here, our original complaint challenged different sales than what we have at issue here. The government moved for discretionary transfer and never raised the argument that there was improper venue as to the footnotes. But the intervener did at the very end of the proceedings. They did in a surreply and in a summary way. And it is true that the district court in a footnote said, well, I think there is real property. But the point is after we filed our first amendment complaint and added in these specific sales, the phase one sales, both the government, Wyoming and WEA filed motions to dismiss under rule 12B3 for improper venue, but they only identified this NPL project, the 3,500 well project in Wyoming. They did not address the phase one sales. They never mentioned- Ordinarily, ordinarily, for most issues, if the district court rules on it, there's no waiver because you have, you can appeal from what the district court ruled on whether you raised it or not. That's ordinarily the case, right? And ordinarily, I would think it was also the case that if the district court ruled on it in one phase of the case and there's no way he would, and he said later, in fact, I mean, he wasn't gonna walk away from that. Then there was no point in raising it the second time. And they could appeal from the decision the first time. So why then is it, what's special about venue? That's what I wanna know. Well, in my mind, the fact that there was no motion made at all about these phase one sales is important. But on the merits, I disagree with the government that it's clear. It is actually very clear that we do have proper venue in the District of Idaho. Well, I would think that it's pretty clear that you had venue on the IM issue, but it's gone. And on the individual sales, I don't know. What does it mean to say, if this is about the validity of a lease, isn't that about on a case-by-case basis, isn't that about the real property? Your Honor, the venue statute was adopted in 1962 before there was any NIFMA, FLIPMA, Endangered Species Act or anything. The deputy attorney general letter from Byron White that is quoted in a variety of the cases in the briefings, when you read it closely, it's focused on applicants for real property interests, grazing, mining, oil and gas, people who want to get a lease or who are challenging the lease. That is an interest in real property. And that's how they understood- But you're challenging the lease. No, we are not. We are challenging BLM's decision to offer leases for sale in violation of NIFMA, FLIPMA and other things. And that is a public land- Well, if that's true, then why is the remedy to vacate the lease? The remedy was to vacate the lease sales that approved the lease. Yes. Well, it should be technically- But we are not claiming that. Vacate the order of the lease of sale. And this is where we cite all these cases going back to soon after these environmental statutes were adopted in the early 70s with the court saying, wait a minute, that language of real property is focused on people who are applying for it. Do you want a lease? Are you challenging a denial of a lease? Then you have to bring it in the district. You can't bring it where you are. You have to bring it in the district where it happened. But that's not what we're doing. We don't want, we're not seeking any right title or interest in lease. And there are third parties involved here, whether it's Wyoming or WA or others- But you're insisting that we have to vacate the lease, not only the offer to sell the lease, but the lease. The leases need to be vacated. That is correct. But that still doesn't mean that it's our claim is about right title or interest in real property. So I think if you read those cases, most of them are district court. Counselor, you're phrasing there about your claim was about, if I heard you use the term, your claim is about a right title or interest. They want a piece of property. You want them not to have the piece of property. Why should there be a difference in where they're litigated? They have to go to Wyoming to try to get their property. If they're suing, you get to go to Maine and tell them they can't get that piece of property. We're not trying to say they don't get the property. We're saying BLM has to follow the law. And that arises in many contexts, whether it's challenging land use plans, whether it's challenging logging or whatever. And what we're starting to see from the federal government is them saying, oh, this is real property. This is real property. This is real property. Anything involving the public lands is real property. And that was not the intent of the venue statute. In 1962, they broadened venue to give more choices for plaintiffs, not narrowed it. And the exception is if you're seeking a right title or interest in real property, then you got to sue where it is, but not where you are. But that is not what we're doing. Or you said you're challenging it. But you seem to be saying only if you're challenging it in the sense that you want that piece for yourself. That's correct. Then you're challenging it in the sense that you think nobody should have it. If you read the case in Byron Wright's letter, it's about applicants and the Laurent, I'm sorry, the Landis and Ferguson cases are the two ones that did transfer venue. And in both those, the plaintiffs were seeking to get the leases. And that's what led to it. And there's no other, we're not in that situation. We don't want those leases. Counsel, what is the word in the statute? Seeking is not the word in the venue statute, is it? It's to involve real property. Involving, right. That's correct. And the question is, what does that mean when it was adopted in 1962? And we've had numerous court decisions taking a look at it and saying, hey, almost anything involves real property. What was Congress trying to do here? They were trying to broaden venue choices and public lands management, environmental compliance does not involve real property in the serious direct way that was intended back in 1962. And there's no other thing. Your time has just passed. Do you have another question? I'll let it go. Thank you, your honor. Your time is up and we'll go to, and the case of Western Watersheds Project versus Bernhardt and State of Wyoming is submitted and we'll go to the next case, and the last case of the day, which has some overlap, Montana Wildlife Federation versus Bernhardt.
judges: Boggs, Berzon, Murguia